**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | |
|---|---|
| RONNIE SHANE DANDRIDGE, ) | |
| ) | No. 9:12-cv-03066-DCN |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | **ORDER** |
| CAROLYN W. COLVIN, *Acting* ) | |
| *Commissioner of Social Security*,[1] ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on Magistrate Judge Bristow Marchant's Report and Recommendation ("R&R") that this court affirm Acting Commissioner of Social Security Carolyn Colvin's decision denying plaintiff's application for supplemental security income ("SSI") and disability insurance benefits ("DIB"). Plaintiff filed objections to the R&R. For the reasons set forth below, the court adopts the R&R and affirms the Commissioner's decision.

## I. BACKGROUND

Unless otherwise noted, the following background is drawn from the R&R.

### A.  Procedural History

Plaintiff Ronnie Shane Dandridge ("Dandridge") filed an application for SSI and DIB on March 16, 2009, alleging disability beginning on August 11, 2006. The Social Security Agency denied Dandridge's claim initially and on reconsideration. Dandridge requested a hearing before an administrative law judge ("ALJ"), and ALJ Augustus C.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this lawsuit.

1

Martin held a hearing on January 7, 2011.  The ALJ issued a decision on January 14, 2011, finding Dandridge not disabled under the Social Security Act.  Dandridge requested Appeals Council review of the ALJ's decision.  The Appeals Council declined to review the decision, rendering the ALJ's decision the final action of the Commissioner.

On October 24, 2012, Dandridge filed this action seeking review of the ALJ's decision.  The magistrate judge issued an R&R on April 1, 2014, recommending that this court affirm the ALJ's decision.  Dandridge filed objections to the R&R on April 30, 2014 and the Commissioner responded to Dandridge's objections on May 16, 2014.  The matter is now ripe for the court's review.

**B.     Medical History**

Dandridge was born on January 6, 1973 and was 33 years old on the alleged onset date.  Tr. 49.  He has an eleventh grade education and past relevant work experience as a sheet metal mechanic and construction worker.  Tr. 51, 198.  Dandridge first complained of back pain during a January 23, 2006 visit to Dr. Michael Smith, his family physician.  Tr. 236.  At that time, radiographic studies noted no abnormalities, id., although an x-ray showed a mild decreased disc height at L5-S1.  Tr. 237.

On August 22, 2006, Dandridge returned to Dr. Smith complaining that he had a sharp pain in his back while doing some heavy lifting and that since then, he had been experiencing severe low back pain and stiffness.  Tr. 235.  Dr. Smith noted that Dandridge was able to ambulate without difficulty and diagnosed him with low back pain with associated muscle spasm.  Id.  Around that same time Dr. Smith performed an MRI,

which showed disc desiccation and disc space narrowing at the L5-S1 level, with broad disc protrusion.  Tr. 232.

Dandridge was referred by Dr. Smith to the Southeastern Spine Institute, where he was evaluated by Dr. Steven Poletti on September 13, 2006.  Tr. 241.  Dandridge told Dr. Poletti that he had back pain off and on since his early 20s and complained of pain in his low back, buttocks, hip and leg, with pain on his left side being greater than the right side.  Id.  Dr. Poletti diagnosed Dandridge with disc herniation left L5-S1, and noted that he did not consider Dandridge as a surgical candidate.  Id.  Dr. Poletti also gave Dandridge an epidural injection.  Id.  On the same day, Dr. Poletti completed a patient status report indicating that Dandridge "cannot work."  Tr. 459.

On October 24, 2006, Dandridge returned to Dr. Poletti for a follow-up appointment.  Tr. 238.  Dr. Poletti noted that the epidural injection had "helped him," although he was "far from 100%."  Id.  Dr. Poletti recommended "observation" of Dandridge's condition and noted that Dandridge should follow-up on an "as needed basis."  Id.

On November 22, 2006, state agency physician Dr. Jean Smolka reviewed Dandridge's medical records and completed a residual functional capacity ("RFC") assessment.  Tr. 242-49.  In her assessment, Dr. Smolka opined that Dandridge could: occasionally lift twenty pounds and frequently lift ten pounds; stand or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and occasionally balance, stoop, crouch, crawl, and climb ladders, ropes, and scaffolds.  Id.

Seven months later, on June 18, 2007, Dr. Ifeanyi Nwaekwu performed a consultative examination.  Tr. 250-53.  Dandridge told Dr. Nwaekwu that he had a

constant, dull pain at level five on a ten-point scale and that his symptoms become worse when standing for long periods of time. Tr. 250. On examination, Dr. Nwaekwu found Dandridge to not be in painful distress, as well as having normal muscle tone and reflexes and full strength in both his upper and lower extremities. Tr. 251. Dr. Nwaekwu noted that Dandridge had a normal gait, was able to get on and off the examination table without assistance, and ambulated without any assistive devices. Tr. 252. Dandridge was able to squat and get up without assistance, although there was some associated back pain. Id. An x-ray showed no significant change from his January 2006 x-ray. Id. Dr. Nwaekwu diagnosed Dandridge with lumbosacral spine disc herniation at L4-S1 with evidence of central disc herniation at L4-L5 and left-sided disc herniation at L5-S1. Id. Dr. Nwaekwu opined that Dandridge would be "unable to return to his previous job as a heating and air repairman because that involves heaving lifting that may aggravate his disc herniation," but noted that "he will benefit from retraining in another occupation that does not require heavy lifting or prolonged standing." Tr. 252-53.

On August 28, 2007, Dandridge had another epidural steroid injection at Southeastern Spine Institute. Tr. 262. The following month, a second state agency physician, Dr. Jim Liao, completed an RFC assessment after reviewing Dandridge's records. Tr. 263-70. Dr. Liao opined that Dandridge could: occasionally lift twenty pounds and frequently lift ten pounds; stand or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and occasionally stoop and climb ladders, ropes, and scaffolds. Tr. 264-65.

On July 15, 2008, Dr. Poletti completed another patient status report, again indicating that Dandridge "cannot work" due to "severe lumbar disc disorder." Tr. 458.

4

On September 9, 2008, Dr. Sanjay Kumar performed a vocational rehabilitation examination. Tr. 272-74. Dr. Kumar found Dandridge to have no edema, cyanosis, or deformity; no swelling in either knee; and full range of motion in all joints. Tr. 273. Dandridge also had full strength in both his lower and upper extremities. Id. Dr. Kumar's detailed orthopedic examination found normal results with the exception that Dandridge complained of lower back pain when he rotated 60 degrees on both sides while in the supine position. Id. Dr. Kumar noted that Dandridge had no difficulty getting on and off the examination table, had no gait disturbances, and was not using any ambulatory assistive devices. Id.

On September 16, 2008, Dr. Liao completed a new RFC assessment. Tr. 277-84. Dr. Liao opined that Dandridge retained the capacity for medium work and that he could: occasionally lift 50 pounds, frequently lift 25 pounds, and occasionally climb ladders, ropes, or scaffolds. Tr. 278-79. Dr. Liao removed his previous limitation on stooping. Tr. 279.

Dandridge returned to Dr. Poletti for a follow-up appointment on October 23, 2008. Tr. 287. Dandridge complained of back pain and extreme weakness in his legs, told Dr. Poletti that he could not feel his legs, and asked for another steroid injection. Id. Dr. Poletti noted that x-rays showed moderately severe spondylosis in the paracervical region. Id. Dr. Poletti opined that Dandridge would not be able to return to "exertional level work," but remained hopeful that he would respond to non-operative care. Id. He also noted that Dandridge may be a candidate to pursue long-term disability. Id. Dandridge received another steroid injection on November 25, 2008. Tr. 286.

On December 9, 2008, Dandridge saw Dr. Poletti again. Tr. 285. Dr. Poletti noted "mild spondylosis but nothing significant." Id. Dr. Poletti recommended an updated MRI scan. Id. On the same day, Dr. Poletti again completed a patient status report indicating that Dandridge could not work. Tr. 456. Dandridge underwent an MRI on January 7, 2009, which showed evidence of protruding disc material at two levels with potential nerve root compression at levels L4-5 and L5-S1. Tr. 288-89. On the same day, Dr. Poletti completed another patient status report indicating that Dandridge could not work. Tr. 455.

Dandridge saw Dr. Smith again on April 8, 2009 and again complained of back pain. Tr. 290. On May 7, 2009, Dr. Poletti completed another patient status report stating that Dandridge "cannot work." Tr. 454. The same month, Dr. Liao completed an updated RFC assessment in which he opined that Dandridge could: occasionally lift twenty pounds and frequently lift ten pounds; stand or walk for six hours in an eight-hour workday; and occasionally stoop, crouch, crawl, and climb ramps and stairs. Tr. 299-300.

On June 10, 2009, Dr. Poletti completed a physician's report, opining that Dandridge was "permanently and totally disabled" and "not able to work in his[] usual occupation." Tr. 453. Dandridge subsequently visited Dr. Poletti for a follow-up examination on July 23, 2009. Tr. 396. Dandridge complained of severe pain radiating into his leg, and Dr. Poletti opined that he had increased sequestration of his disc. Id. Dr. Poletti noted that Dandridge was walking with a cane. Id. Dandridge then underwent an MRI, which Dr. Poletti noted showed "sequestered disc herniation lateralized into the left

of the L5-S1 level." Tr. 397. Dr. Poletti also noted that Dandridge was at risk of re-herniation and continued back pain, and recommended him for surgery. Id.

Dandridge underwent a laminectomy-discectomy L5-S1 on August 20, 2009. Tr. 345, 394. At a post-operative visit to Southeastern Spine Institute on September 4, 2009, physician assistant Amanda Thurber noted that Dandridge was "doing fairly well," had some increased swelling in his left foot, and used a brace and cane for assistance. Tr. 393. Dandridge was taking Lortab two to three times a day and Soma three times a day to help alleviate his pain. Id. At a second post-operative visit on October 1, 2009, physician assistant Justin Swain noted that Dandridge reported having "difficulty walking secondary to pain in his leg," but stated that "it does feel different than it did before surgery." Tr. 408. Dandridge also complained of worsening dysesthesia into his leg. Id. On examination, Dandridge was ambulatory with an antalgic gait, left side favored, with subjective dysesthesia to his lower left extremity and slight diminished Achilles tendon reflex. Id.

On November 19, 2009, Dandridge returned to Southeastern Spine Institute for a follow-up examination with Thurber. Tr. 409. Dandridge reported that Lyrica was helping with the burning sensation down his left hip and buttock region, although he still had some muscle spasms and left-sided hip pain. Id. He was ambulatory with cane assistance. Id. At a visit with Thurber on January 7, 2010, Dandridge reported that therapy had "gone fairly well" and that his strength was improving in his left lower extremity, although he had "pretty intense spasms on his left leg and across his lower back." Tr. 424. He noted that Lyrica helped with his leg pain. Id. Thurber found him to be ambulatory with an antalgic gait and Dandridge was still using a cane for assistance.

7

Id. On a March 4, 2010 visit to Swain, Dandridge reported being "no better [and] no worse." Tr. 436. He stated that his continued back pain and radiating buttock, hip, and leg pain was "not intractable," but that he was concerned with it. Tr. 436.

An MRI of the lumbar spine on March 23, 2010 noted signal loss and a central protrusion of disc material with annular tearing at L4-5, as well as a "previous left-sided laminectomy with some granulation tissue" and mild displacement of the left S1 nerve root at L5-S1. Tr. 438. Dandridge was seen by Swain six days later, and Swain noted that the MRI confirmed that he had degenerative disc disease at L5-S1 with a history of laminectomy for disc herniation. Tr. 437. Although Dr. Poletti had discussed an anterior fusion surgery with Dandridge in the past, Swain opined that it should not be considered at this time. Id.

On April 7, 2010, state agency physician Dr. Tom Brown reviewed Dandridge's medical records and completed an RFC assessment. Tr. 440-47. Dr. Brown opined that Dandridge could: occasionally lift twenty pounds and frequently lift ten pounds; stand or walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. Tr. 441-42. He also opined that Dandridge was limited in reaching in all directions, including overhead. Tr. 443. Dr. Brown expected Dandridge to be able to perform a wide range of sedentary work by August 2010. Tr. 447.

Dandridge was seen by Thurber again on August 2, 2010. Tr. 452. He continued to have "significant left-sided back, buttock, hip, and leg pain." Id. Thurber noted that Dandridge's physical examination was "unchanged." Id. On September 21, 2010,

8

Dandridge was seen by Dr. William Richardson for a consultative examination on referral from Dr. Poletti. Tr. 472-74. Dandridge reported that on the day of examination, his pain was a seven out of ten, but that it fluctuated between six and ten out of ten depending on his level of activity. Tr. 472. Dr. Richardson noted that Dandridge had a slightly antalgic gait, four out of five strength in his lower left extremity, and mild muscle wasting on the left compared to the right. Tr. 473. Dr. Richardson referred Dandridge for rhizotomy and increased his pain medication. Tr. 474.

On December 6, 2010, Dandridge again saw Swain. Tr. 469. Dandridge continued to "have pain in his low back, buttock, hip, and left leg," and his pain had increased because he fell over his son and dog in the yard. Id. Swain noted that Dandridge had a loss of range of motion in his lumbar spine with significant antalgic gait and that he favored his left lower extremity. Id. Swain recommended that Dandridge "be out of work secondary to his physical limitations as well as his analgesic needs," and noted that "[c]ertainly any type of construction or exertional job would be out of the question for him." Id.

### C.     ALJ's Decision

The ALJ employed the statutorily-required five-step sequential evaluation process to determine whether Dandridge was disabled from March 16, 2009 through January 14, 2011. The ALJ first determined that Dandridge had not engaged in substantial gainful activity since August 11, 2006, the alleged onset date. Tr. 27. At the second step, the ALJ found that Dandridge suffered from the following severe impairment: disorders of the back. Id. At step three, the ALJ determined that Dandridge's impairment did not meet or equal one of the listed impairments in the Agency's Listing of Impairments ("the

Listings"). Tr. 28; see 20 C.F.R. Part 404, Subpt. P, App'x 1. Before reaching the fourth step, the ALJ determined that Dandridge had the residual functional capacity ("RFC") to perform sedentary work, as defined by 20 C.F.R. §404.1567(a). Id. Specifically, the ALJ found that Dandridge could: lift and carry up to ten pounds occasionally and lesser amounts frequently; sit for six hours in an eight-hour workday; and stand and walk occasionally. Id. The ALJ further determined that Dandridge could not climb ladders, ropes, or scaffolds, could only occasionally perform other postural movements and reach overhead, and must be able to alternate positions at will. Id. The ALJ found, at step four, that Dandridge was unable to perform any of his past relevant work. Tr. 34. Finally, at the fifth step, the ALJ that considering Dandridge's age, education, work experience, and RFC, he could perform jobs existing in significant numbers in the national economy, and therefore concluded that he was not disabled during the period at issue. Id.

## II.  STANDARD OF REVIEW

This court is charged with conducting a de novo review of any portion of the magistrate judge's R&R to which specific, written objections are made. 28 U.S.C. § 636(b)(1). A party's failure to object is accepted as agreement with the conclusions of the magistrate judge. See Thomas v. Arn, 474 U.S. 140, 149-50 (1985). The recommendation of the magistrate judge carries no presumptive weight, and the responsibility to make a final determination rests with this court. Mathews v. Weber, 423 U.S. 261, 270-71 (1976).

Judicial review of the Commissioner's final decision regarding disability benefits "is limited to determining whether the findings of the [Commissioner] are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907

F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Id.  (internal citations omitted).  "[I]t is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence."  Id.  Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]," not on the reviewing court.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citation omitted).

### III.   DISCUSSION

Dandridge objects to the R&R on two grounds:  (1) the magistrate judge erred in finding that substantial evidence supports the ALJ's rejection of "virtually all of the opinion evidence regarding Mr. Dandridge's mobile impairments;" and (2) the magistrate judge erred in finding that the ALJ had properly followed the treating physician rule.  Because Dandridge's first objection deals almost entirely with the weight given to Dr. Poletti's opinions, the court will consider both objections together to determine whether the ALJ properly applied the treating physician rule.[2]

---

[2] To the extent that Dandridge asserts a general objection that substantial evidence does not support the ALJ's decision as a whole, it is not the province of this court to reweigh conflicting evidence.  Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) ("In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence. . . ." (citing Craig, 76 F.3d at 589)).  In this case, reasonable minds could disagree concerning whether Dandridge is disabled – there was evidence that Dandridge could perform light work and evidence that he could perform no work.  The ALJ gave Dandridge "the benefit of the doubt" by reducing his RFC to sedentary work.  Tr. 33. Therefore, the court finds that the ALJ's decision is supported by substantial evidence and the court will not reweigh the evidence.

11

Regulations require that a treating physician's opinion be given controlling weight if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); see, e.g., Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). "By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590. In such a circumstance, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro, 270 F.3d at 178.

If a treating physician's opinion does not merit controlling weight, the ALJ is to evaluate it using the following factors: (1) whether the physician has examined the applicant; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by relevant medical evidence; (4) the extent to which the opinion is consistent with the record as a whole; (5) the relevance of the physician's medical specialization to the opinion; and (6) any other factor that tends to support or contradict the opinion. 20 C.F.R. § 404.1527(c); see SSR 96–2p; Hines, 453 F.3d at 563. However, the Fourth Circuit has not mandated an express discussion of each factor and another court in this district has held that "an express discussion of each factor is not required as long as the ALJ demonstrates that he applied the . . . factors and provides good reasons for his decision." Hendrix v. Astrue, No. 1:09-cv-1283, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010); see also § 404.1527(c)(2) (requiring ALJ to give "good reasons" for weight given to treating source's opinion). A district court will not disturb an ALJ's determination as to the weight to be assigned to a medical opinion, including the opinion

of a treating physician, "absent some indication that the ALJ has dredged up 'specious inconsistencies' . . . or has not given good reason for the weight afforded a particular opinion." Craft v. Apfel, 164 F.3d 624, 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam) (unpublished table decision) (internal citation omitted).

Dandridge argues that the ALJ erred in failing to afford great weight to the opinions of Dr. Poletti. Pl.'s Objections 3. When considering Dr. Poletti's opinions, the ALJ first noted that the determination of whether an individual is disabled is reserved for the Commissioner and that such an opinion is not given any special significance on the issue of disability. Tr. 33; see 20 C.F.R. § 404.1527(d)(1), (3) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled. . . . We will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . ."). The ALJ then gave "some weight" to Dr. Poletti's opinion that Dandridge would not be able to return to exertional level work activity. Tr. 33. However, the ALJ afforded Dr. Poletti's opinions that Dandridge could not work "little weight," determining that "they are inconsistent with the other evidence of record," "[s]pecifically, examinations from June 2007 and September 2008 were essentially normal." Id.

Dandridge argues that the ALJ's characterization of the June 2007 and September 2008 examinations is a "gross exaggeration" and that "there does not exist persuasive contradictory evidence to rebut the opinion of Dr. Poletti." Pl.'s Objections 2-3. As discussed above, in June 2007 Dandridge was examined by Dr. Nwaekwu. Dr. Nwaekwu noted full strength in both of Dandridge's lower extremities, normal muscle tone and reflexes in both lower extremities, and a normal gait. Tr. 251-52. Dr. Nwaekwu noted

that Dandridge was not in acute pain, and that while he could not return to his job as a heating and air repairman, he could be trained in another occupation that does not require heavy lifting. Tr. 252-53. It is readily apparent that Dr. Nwaekwu's examination was inconsistent with Dr. Poletti's opinions that Dandridge would be unable to return to work.

In September 2008, Dandridge was examined by Dr. Kumar. Dr. Kumar found "no edema, cyanosis, or deformity" of Dandridge's extremities. Tr. 273. He also noted full strength in Dandridge's lower extremities. Id. A detailed orthopedic examination resulted in generally normal results, with the exception of the straight leg raising test while Dandridge was in the supine position, which resulted in pain in his lower back. Id. Again, it is apparent why the ALJ classified Dr. Kumar's examination as "essentially normal" and found it to be inconsistent with the opinions of Dr. Poletti. Tr. 33.

The ALJ gave good reasons – inconsistency with the other evidence of record, specifically two examinations which were essentially normal – for discounting Dr. Poletti's opinions. There is no indication that the ALJ dredged up specious inconsistencies in discounting Dr. Poletti's opinions. Moreover, the ALJ gave one of Dr. Poletti's opinions some weight and based his RFC in part on that opinion. Therefore, the court will not disturb the ALJ's determination as to the weight to be assigned to Dr. Poletti's opinions.[3]

---

[3] This case is distinguishable from the court's decision in Barringer v. Colvin, No. 5:12-cv-353, 2014 WL 798410 (D.S.C. Feb. 27, 2014). In Barringer, the ALJ discounted the treating physician's opinion, saying only that such opinion was "not supported by the evidence or by his own findings." Id. at *3. In that case, it was the ALJ's utter failure to explain the inconsistencies that demanded remand to the ALJ. Here, the ALJ's analysis of Dr. Poletti's opinion, although not overly-detailed, specifically mentions other evidence in the record to support his conclusion.

Dandridge also argues that the ALJ erred in failing to afford great weight to Swain's opinion. Pl.'s Objections 3. The court first notes that Swain's opinion is not subject to the treating physician rule because he is a physician assistant. In order to qualify for the treating physician rule, a physician's report must be a "medical opinion." See 20 C.F.R. § 404.1527(c) (discussing treating physician rule in subsection titled "How we consider medical opinions"). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2) (emphasis added). "Acceptable medical sources" include licensed physicians, psychologists, or other medical providers; however, physician assistants are not considered "acceptable medical sources," but rather "other sources." 20 C.F.R. § 404.1513(a), (d). Therefore, to the extent that Dandridge includes the ALJ's treatment of Swain's opinion under the heading "The ALJ erred in failing to follow the treating physician rule," Dandridge's objection fails.

Even though evidence from sources other than acceptable medical sources are not subject to the treating physician rule, such evidence may be used to show the severity of a claimant's impairments and how it affects the claimant's ability to work. 20 C.F.R. § 404.1513(d). "The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case." SSR 06-03p. "Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." Id. When evaluating such a source, "the adjudicator generally should explain the weight

given to opinion[] . . . or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." Id.

Swain opined that Dandridge "is someone who is recommended to be out of work secondary to his physical limitations as well as his analgesic needs. Certainly any type of construction or exertional job would be out of the question for him." Tr. 469. After considering Swain's opinion, the ALJ afforded it limited weight because "it is not specific and it appears to contain inconsistencies." Tr. 34. The ALJ noted that "[t]he opinion is not clear as to whether Mr. Swain opined that the claimant could not work at all or if the claimant was not capable of only exertional occupations." Id. Although Dandridge argues that Swain's opinion "plainly indicated that Mr. Dandridge is unable to work in any capacity," Pl.'s Objections 4, the court agrees with the ALJ that Swain's opinion is ambiguous. While Dandridge asserts that the first sentence quoted above indicates that he is unable to work in any capacity, it appears just as likely that Swain is recommending that Dandridge be held out of the construction job he was working in at the time of his injury and that the next sentence confirms that he would not be able to go back to such a job. Additionally, the use of the word "certainly" in reference to exertional jobs suggests that Swain may have considered it possible for Dandridge to work at a less strenuous job. Because Swain's opinion is ambiguous, the ALJ adequately explained the weight given to the opinion.

## IV.   CONCLUSION

Based on the foregoing, the court **ADOPTS** the magistrate judge's R&R, and **AFFIRMS** the Commissioner's decision.

**AND IT IS SO ORDERED**.

```
              DAVID C. NORTON
              UNITED STATES DISTRICT JUDGE
```

**August 12, 2014**
**Charleston, South Carolina**